**In re Robert R. CRAMER, Debtor.**

**David E. KIMMLE and Robert B. Morris, II, as Personal Representative of the Estate of Charles Richard Kimmle, Plaintiffs,**

v.

**Robert R. CRAMER, Defendant.**

**Bankruptcy No. 87–4466–8P7. Adv. No. 87–463.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 1, 1988.

David A. Townsend, Tampa, Fla., for plaintiffs.

Jay W. Fusco, Tampa, Fla., Charles Medearis, St. Petersburg, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case and the matter under consideration is a Complaint filed by the Plaintiffs, David E. Kimmle and Robert B. Morris, II, as personal representative of the estate of Charles Richard Kimmle (Plaintiffs), which seeks a determination that certain debts allegedly owed by Robert B. Cramer (Debtor) should be declared to be nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. Particularly, the Complaint alleges in a single count that the Debtor committed acts of defalcation while acting in a fiduciary capacity. Based on the evidence established at the final evidentiary hearing on this matter, the Court finds as follows:

It is undisputed that sometime in early 1984, the Plaintiffs and the Debtor entered into an agreement pursuant to which the Debtor agreed to sell six automobiles owned by the Plaintiffs and their sister, specifically, a 1968 Silver Jaguar Roadster; a 1979 red Ford Bronco; a 1977 black Ford Ranchero; a 1971 red Porsche; a 1970 Jaguar; and a 1978 Datsun 280–Z.

Under the agreement, the Debtor was to deposit the title certificates to the cars in a safety deposit box set up by the Debtor and David E. Kimmle (Plaintiffs' Exh. No. 1), and when the vehicles were sold by the Debtor with the approval of the Plaintiffs, the Plaintiffs would endorse the title certif-icates in order to enable the Debtor to consummate the sale. It was further agreed that the proceeds from the sales would be deposited in a joint checking account set up by the Debtor and David E. Kimmle on which both were named as signatories (Plaintiffs' Exh. No. 3). Finally, the Debtor would be paid a commission, the amount of which is not disclosed in the record, and all of his out-of-pocket expenses for each sale and the balance would be paid over to the Plaintiffs.

In order to carry out the agreement, the Plaintiffs drove the six cars from Columbus, Ohio, to Clearwater, Florida, where they were delivered to a car lot owned and operated by Clearwater Auto Sales, Inc., a corporation in which the Debtor was at the time relevant an officer and a 50% shareholder. It appears that in conjunction with the delivery of the automobiles, title certificates for the cars were delivered to the Debtor. Of the six title certificates, only one was endorsed in blank and the remainder were to be endorsed by the Plaintiffs to the subsequent purchasers of the cars.

It was further agreed upon by the parties that each vehicle would not be sold for less than an agreed upon price, specifically, $9,000 for the 1968 Jaguar; $5,500 for the 1979 Bronco; $3,000 for the 1977 Ranchero; $6,000 for the 1971 Porsche; $9,500 for the 1970 Jaguar; and $5,500 for the 1978 Datsun. It is undisputed that all six of the cars were sold for the following prices: The 1968 Jaguar was sold on April 5, 1984, for $6,500; the 1979 Bronco was sold on April 23, 1984, for $5,695; the 1977 Ranchero was sold on April 12, 1985, for $2,535; the 1971 Porsche was sold on November 5, 1984, for $4,500; the 1970 Jaguar was sold sometime prior to April 5, 1984, for $7,900; and the 1978 Datsun was sold for $4,900 sometime in January of 1985. (Plaintiffs' Exh. No. 3) Therefore, it appears that with the exception of the 1979 Bronco, the vehicles were sold by the Debtor for $465 to $2,500 less than the prices agreed upon by the Plaintiffs. It is stipulated that when the six vehicles were sold, the signatures of the Plaintiffs and their sister were forged on the title certifi-

cates, although there is no evidence in this record to establish who committed the forgery. (Plaintiffs' Exh. 4–7)

In mid–1984, the parties entered into a second oral agreement for the sale of cars. On July 31, 1984, in an attempt to reduce this agreement to writing, the Debtor drafted two identical "Joint Venture Agreements". Each provided that Clearwater Auto Sales, Inc., and each of the Plaintiffs would "engage in and carry on as joint venturers in the buying and selling of vehicles for profit." (Plaintiffs' Exhs. 8 and 9) The draft further provided that the joint venture would be conducted under the name of Clearwater Auto Sales, Inc., and it was agreed that Richard Kimmle would contribute the sum of $14,300 and David Kimmle would contribute the sum of $11,-250, for the purchase of used cars and Clearwater Auto Sales would contribute managerial and sales skills and the use of its sales lot. The proposed agreements further provided that Clearwater Auto Sales would have "complete discretion in the buying and the selling of the vehicles"; that legal title to the joint ventures property would be taken in the name of Clearwater Auto Sales, Inc., as Trustee; that Clearwater Auto Sales would place the title to the automobiles in a safety deposit box; that the parties would have access to the safety deposit box; and that "the beneficial interest in such property, unless changed pursuant to the terms of this agreement, shall be in co-venturer to the extent of his contribution" and any accumulative profits added to his account. Profits of the joint ventures would be divided as follows: 60% to Clearwater Auto Sales, Inc., and 40% to David E. Kimmle and Richard Kimmle, each. Finally, the proposed agreements provided that both David E. and Richard Kimmle had the option to withdraw their profits upon 30 days notice to Clearwater Auto Sales. (Plaintiffs' Exhs. 8 and 9). While these agreements appear to reflect and embody an oral agreement entered into between the Plaintiffs and either the Debtor, or Clearwater Auto Sales, apparently the Plaintiffs refused to execute the agreements due to a disagreement over the inclusion of Clearwater Auto Sales as co-ven-turer. It is the contention of the Plaintiffs that they never agreed to have Clearwater Auto Sales, Inc., to be included as a co-venturer. In this connection, it should be noted that the Plaintiffs asserted in a separate suit filed by them in the United States District Court for the Middle District of Florida that the joint venture agreement was entered into with Clearwater Auto Sales, Inc., contrary to their present contention. It is without dispute that Richard Kimmle and David Kimmle did in fact give the Debtor $14,300 and $11,250, respectively, for the purposes set forth in the agreement.

The record further reveals that no checks were written by the Debtor to the Plaintiffs drawn on the bank account established for that purpose, but that checks were drawn by the Debtor on the bank account maintained by Clearwater Auto Sales, Inc., and the Plaintiffs received the following payments from Clearwater Auto Sales, Inc.: Four payments in the amount of $250 each on September 1, September 30, October 15, and November 16, 1984, and five checks in the amount of $1,000 each on February 12, February 6, March 1, March 15 and April 17, 1985. (Debtor's Exh. 1) In addition, Clearwater Auto Sales, Inc., purchased a cashiers check payable to the Plaintiffs in the amount of $5,000 on November 9, 1984 (Debtor's Exh. 1), and the Debtor purchased money orders in the amount of $50 on November 2, 1987, $150 on October 14, 1987, and $100 on December 1, 1987, all of which were sent to the Plaintiffs. (Debtor's Exh. 1) In all told, the Plaintiffs received $11,300 from Clearwater Auto Sales and the Debtor. However, as noted earlier, none of these checks were drawn on the checking account maintained in the names of the Debtor and David E. Kimmle.

Subsequently, when the Plaintiffs became dissatisfied with the amount of money received from the Debtor, the Plaintiffs filed suit against the Debtor and Clearwater Auto Sales, alleging, inter alia, that the Plaintiffs had entered into joint venture agreements with Clearwater Auto Sales and that Clearwater Auto Sales had

breached the joint venture agreement. The only Count of the Complaint in which the Plaintiffs asserted a claim against the Debtor was one alleging that the Debtor had converted the 6 automobiles the Debtor was to sell on behalf of the Plaintiffs. On June 29, 1987, the Plaintiffs obtained a final judgment by default against both Clearwater Auto Sales, Inc., and the Debtor and in favor of David Kimmle in the amount of $49,128.30 and in favor of Charles Richard Kimmle in the amount of $24,278. Subsequent to the entry of the judgment Charles Richard Kimmle died and Robert B. Morris, II, became his personal representative of his estate.

■ Based on these facts, it is the contention of the Plaintiffs that the Debtor committed defalcation while acting in a fiduciary capacity and, therefore, the debt represented by the judgment obtained by them should be declared to be nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. Of course, the threshold issue in resolving this matter is whether a fiduciary relationship existed between the parties at the time relevant. It is well established that § 523(a)(4) does not extend to trusts imposed ex maleficio—that is, trusts imposed because of an act of wrongdoing out of which the debt arose. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) The fiduciary relationship must exist from the onset of the relationship between the parties. It is also true that the broad definition of a fiduciary relationship, one involving confidence, trust, and good faith, is insufficient to prove a cause of action pursuant to § 523(a)(4). *See Angelle v. Reed (In re Angelle*), 610 F.2d 1335 (5th Cir.1980) Although the definition of "fiduciary" under § 523(a)(4) is a matter of federal law, the court must consult applicable state law in determining whether the type of trust relationship contemplated by § 523(a)(4) exists. *See Ragsdale v. Haller,* 780 F.2d 794 (9th Cir.1986)

■ Considering first the parties' agreement as to the six cars, this Court is satisfied that the Debtor was acting only as a commission agent and not as a fiduciary. Clearly, this type of commercial relationship between the parties does not rise to the level of fiduciary duty required by § 523(a)(4). *See Quarles Oil Co., Inc. v. Williams (In re Williams),* 7 B.C.D. 45, 2 C.B.C.2d 796 (Bkrtcy.W.D.Va.1980)

Considering next the joint venture agreements, case law in the state of Florida provides that joint venturers owe each other "the punctilio of an honor the most sensitive," "the duty of the finest and highest loyalty," *Donahue v. Davis,* 68 So.2d 163, 171 (Fla.1953), and "the utmost good faith, fairness, and honesty." *Reaves v. Hembree,* 330 So.2d 747, 749 (Fla. 1st D.C. A.), *cert. den.,* 345 So.2d 423 (Fla.1977). This is especially true of the joint venturer who is entrusted with the control of the property of the venture. *Id.* Further, the fiduciary relationship between partners, and thus joint venturers, is like that of attorney-client and trustee and cestui que trust. *See* 8 Fla.Jur.2d 580, citing *Alston v. Rowles,* 13 Fla. 110 (1869–1871).

■ This Court is not unaware of several decisions rendered by Bankruptcy Courts in this State holding that the partnership relationship in Florida does not rise to the level required by § 523(a)(4), *see In re Ryan,* 90 B.R. 554 (Bkrtcy.S.D.Fla., 1988), *In re Elliott,* 66 B.R. 466 (Bkrtcy.S. D.Fla.1986), *In re Kelley,* 84 B.R. 225 (Bkrtcy.M.D.Fla.1988) The problem with the cases just cited lies with the courts' reliance on the supposed requirement that there must be an express or technical trust before the relationship is deemed to be fiduciary within the meaning of that term used in 523(a)(4) of the Bankruptcy Code. Such a narrow interpretation of this Section would eliminate relationships which traditionally have been recognized to be fiduciary even though they are not created by an express or technical trust. For instance, it cannot be gainsaid that the relationship between an attorney and a client is not fiduciary in nature; neither is a relationship between corporate officers and stockholders of a corporation. Clearly, Congress did not intend to exclude debts arising from the breach of the duty arising out of such relationships from the reach of

§ 523(a)(4). Based on the Florida common law, which compares the duty of one partner to another to that of a trustee and the trust's beneficiary, *see Alston v. Rowles, supra,* this Court is satisfied that partners owe a fiduciary duty to each other which is within the contemplation of § 523(a)(4).

Based on the foregoing, this Court is satisfied that there is a fiduciary relationship which is inherent in certain relationships which by their very nature command and require the utmost trust and fair dealings between the parties even though they are not created by a technical or express trust. In sum, the real test should be whether or not the fiduciary relationship existed from the very beginning or only came into being as a result of a commission of a wrong. *See Angelle v. Reed (In re Angelle), supra.*

■ Having concluded the foregoing, this leaves for consideration the question whether the Debtor and the Plaintiffs did, in fact, have the relationship which was the relationship of joint venturers.

It is well established that the burden is on the creditor to prove by clear and convincing evidence that the debt in question should be determined to be nondischargeable. *See In re Hunter,* 780 F.2d 1577 (11th Cir.1986) This is so because the exceptions to discharge are construed liberally in favor of the Debtor and strictly against the creditor. Based on the record, this Court is satisfied that the evidence presented on this issue is equally consistent with the proposition that the joint venture was between Cramer qua an individual, and the proposition that the joint venture agreement was between the Plaintiffs and Clearwater Auto Sales, Inc., a corporation. This being the case, it is clear that the Plaintiffs have failed to carry the burden placed on them by law and for this reason their claim of nondischargeability against this individual Debtor must fail.

A separate final judgment will be entered in accordance with the foregoing.